In re RENTAL JOURNAL, INC., Sunstar Publishing, Inc., Journal Press & Graphics, Eli and Lori Lynn Sofro, Debtors.

NCNB NATIONAL BANK OF FLORIDA, Plaintiff,

v.

Eli and Lori Lynn SOFRO, Defendants.

Nos. 89–01015–BKC–SMW through 89–01018–BKC–SMW.

Adv. No. 89–0304–BKC–SMW–A.

United States Bankruptcy Court, S.D. Florida.

Sept. 1, 1989.

Robert C. Meyer, Haley, Sinagra & Perez, P.A., Miami, Fla., for plaintiff.

Jerald Goldstein, Boca Raton, Fla., for defendant.

James B. Boone, Fort Lauderdale, Fla., for Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

THIS CAUSE HAVING come before the court upon a complaint by NCNB NATIONAL BANK OF FLORIDA (hereinafter "NCNB") against ELI AND LORI LYNN SOFRO (hereinafter "SOFRO") seeking to determine the dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(B), and the court having heard the testimony, examined the evidence presented, observed the candor and demeanor of the witnesses, considered the arguments of counsel, and being otherwise fully advised in the premises does hereby make the following Findings of Fact and Conclusions of Law:

Jurisdiction is vested in the Court pursuant to 28 U.S.C. § 1334(d), 28 U.S.C. § 157(a), (b), and the District Court's general order of reference. This is a core proceeding in which the court is authorized to hear and determine all matters relating to this case in accordance with 28 U.S.C. § 157(b)(2)(I).

SOFRO filed bankruptcy before this court on March 6, 1989. In addition to filing individual bankruptcy, various corporations to which Eli Sofro held a 100% stockholder interest filed bankruptcy:

Rental Journal, Inc. (hereinafter "RENTAL JOURNAL"); Sunstar Publishing, Inc. (hereinafter "SUNSTAR"); and Journal Press & Graphics, Inc. (hereinafter "JP & G"). Eli Sofro (hereinafter "debtor") exclusively controlled these companies.

In October of 1986, RENTAL JOURNAL first received loan monies from NCNB. All loans given to RENTAL JOURNAL were guaranteed by the debtor on October 23, 1986.

In June of 1987, RENTAL JOURNAL sought to expand its business enterprise. Although there were separate corporations, RENTAL JOURNAL acted as a parent corporation to SUNSTAR and JP & G. RENTAL JOURNAL was a business which printed small magazines costing consumers $.25 which advertised condominiums or apartment facilities in various areas throughout the state of Florida. Distribution of RENTAL JOURNAL included the cities of Orlando, Miami, Fort Lauderdale, Jacksonville, and Tampa. RENTAL JOURNAL also published a similar magazine in Texas in which it handled an account for Dallas area apartments.

The businesses grossed approximately $115,000.00 to $150,000.00 per month. After reviewing the income statements provided for the year of May, 1986 through May of 1987 of all the various corporations as well as the individual financial statements submitted by the debtor, NCNB increased the loan to RENTAL JOURNAL to the amount of $150,000.00. The note was to mature in one year's time and interest payments were to be made monthly in the interim.

In June of 1987, no principal payments had been paid by the debtors. In addition, overdrafts occurred in the checking accounts held at NCNB. The overdrafts amounted to $14,612.76. NCNB requested the debtor to discuss four alternatives available in June of 1987 to handle the $150,000.00 loan as well as the overdrafts.

The four alternatives available were: (a) selling the accounts receivable to a factor and paying NCNB with the proceeds received by the factor; (b) "lock boxing" the accounts receivable of the debtor; (c) hav-

ing the loan paid off by another institution; and (d) "term out" the loan by having all payments be applied solely to principal.

The debtor did not wish to have a factor purchase the accounts receivable as he believed his customers would be alarmed about his business's solvency. The debtor was not interested in having the accounts receivable "lock boxed," a collection device in which all the accounts receivable are mailed quickly to a Post Office Box so as to expedite collection of the receivables. Debtor believed this would tarnish his business's image. Debtor was unable to get another bank to finance his company so as to pay off the monies owed to NCNB. Debtor was unable to "term out" the loan because he could not afford the monthly payments in excess of $8,000.00 per month for a period of two years.

Instead, debtor approached the bank in September of 1988 with a financial statement which reflected liabilities of $63,000.00 in notes payable and $161,000.00 of mortgage payables. No other liabilities were shown. The assets in his financial statement included: $3,000.00 of cash; $2,300,000.00 of stock; $246,000.00 of real estate; $75,000.00 of automobiles; $5,000.00 of jewelry; and $8,000.00 of furniture. Mrs. Sofro did not sign this financial statement.

NCNB prudently reviewed the financial statements of RENTAL JOURNAL, SUNSTAR and JP & G prepared by an accountant. To protect its interest further, NCNB cross-collateralized the debt of the corporations, received guaranties from each of the corporations and received hypothecation agreements further securing NCNB's interest in the corporations. NCNB also held valid liens over the accounts receivable of RENTAL JOURNAL, SUNSTAR and JP & G. All of these protective measures were employed by NCNB when the note was renewed in September.

In March of 1989, the SOFRO schedules filed in the bankruptcy proceedings evidenced liabilities of $262,500.00 to secured creditors and $697,681.68 to unsecured creditors. In addition, tax liabilities of $1,000.00 existed. The assets included in

the schedules were: $100.00 of cash; no value of stock; $221,000.00 of real estate; $22,000.00 of automobiles; $100.00 of jewelry; and $100.00 of furniture. No assets were transferred between September 1988 to March of 1989. However, valuation of assets drastically differ in the schedules from the values represented in the financial statement.

Neither the financial statement nor the schedules show that there is an outstanding loan owed to Herbert Drucker (hereinafter "DRUCKER"), the father of Lori Sofro, in the amount of $220,000.00. DRUCKER would lend monies to the corporations or SOFRO whenever banking institutions could not provide similar funds. DRUCKER constantly loaned monies over a period of eight (8) years. DRUCKER is a creditor of the SOFRO estate as well as the estate of RENTAL JOURNAL.

DRUCKER'S unsecured debt amasses an amount equal to the scheduled creditors on the financial statement. Had NCNB known that SOFRO was indebted to DRUCKER for such a large sum of money, NCNB would have resorted to "lock boxing" the accounts receivable of the business so as to collect one month's income of the businesses, an amount of approximately $115,000.00 to $150,000.00.

■ NCNB must prove each and every element required under 11 U.S.C. § 523(a)(2)(B) when requesting exception to discharge of the debtor. See *Bank of Coral Gables v. Picou*, 81 B.R. 152 (Bankr.S.D. Fla.1988). The elements required under § 523(a)(2)(B) are: that a debt exists as a result of obtaining money or credit; the money or credit was obtained by financial statement in writing; the financial statement is materially false concerning the financial condition of the debtor; financial statement was made or published with intent to deceive NCNB; NCNB relied upon the financial statement in extending money or credit; and NCNB's reliance on the financial statement was reasonable. See *Picou, supra.*

The only elements brought to issue before the court were: (1) the debtor's intent to deceive NCNB; and (2) the reasonable reliance of NCNB on the financial statement.

■ A Bankruptcy Court may find deceit and fraudulent intent by logically inferring from "the totality of the circumstances." *In re Gitelman*, 74 B.R. 492 (Bankr. S.D.Fla.1987). The totality of the circumstances presented before this court show that an amount of $220,000.00 of unsecured debt was omitted from the financial statement presented September 22, 1988. In addition, various other creditors existed at the time the financial statement was submitted. Those creditors appear in the bankruptcy schedules and are owed in excess of $621,000.00 only five months after delivery of the financial statement.

■ NCNB reasonably relied upon the financial statement submitted in September of 1988 to renew the note due June of 1988. NCNB's reasonable acts included requesting updated financial statements; requesting updated tax returns; obtaining security interests in all the accounts receivable; and having personal guaranties for the debt of RENTAL JOURNAL. See *In re Price*, 48 B.R. 211 at 213 (Bankr.S.D.Fla.1985); *In re Hunter*, 780 F.2d 1577 (11th Cir.1986).

The debtor induced NCNB to renew and extend the $150,000.00 note for the period of June of 1988 through December of 1988 as well as extend his credit on overdrafts amounting to $14,612.76 by giving NCNB the statement delivered September 22, 1988. NCNB's reliance was reasonable because of the apparent dealing with a customer of long-standing coupled with the numerous financial statements prepared by an accountant who handled the corporate affairs. In addition, numerous material false statements in the individual's financial statements amount to overwhelming evidence of an ongoing intent by the debtor to deceive and defraud NCNB. The facts and circumstances of the debtors' conduct evidence the intent. See *In re Gitelman, supra.* at 496.

As set forth herein, the Court finds that NCNB's objection to Eli Sofro's discharge pursuant to 11 U.S.C. § 523(a)(2)(B) is sustained.

■ Lori Sofro did not sign the financial statement or negotiate the loans. She is a housewife unfamiliar with the business affairs. She only became involved with the businesses when she jointly signed a guarantee for the debt of RENTAL JOURNAL. NCNB has not met its burden in excepting her discharge. The action brought against her is accordingly dismissed.

A separate final judgment of even date has been entered in conformity herewith.

DONE AND ORDERED.